IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MIKE D. CLIFTON,

               Plaintiff,

      vs.

JO ANNE B. BARNHART,
Commissioner of Social
Security,

             Defendant.

_____/

CASE NO. CV-F-04-5938 LJO

**DECISION ON SOCIAL SECURITY
COMPLAINT**
(Docs. 11, 14, 15.)

**INTRODUCTION**

      Plaintiff Mike D. Clifton ("plaintiff") seeks this Court's review of an administrative law judge's ("ALJ's") decision that plaintiff is not disabled and is ineligible for disability insurance benefits and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433 and 1381-1381d.  Pursuant to 28 U.S.C. § 636(c) and F.R.Civ.P. 73, the parties agreed to proceed before a United States Magistrate Judge, and by a September 28, 2005 order, this action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all proceedings.  Based on review of the Administrative Record ("AR") and the papers of plaintiff and defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner"), this Court DENIES plaintiff's request to reverse the Commissioner's decision to deny plaintiff disability insurance benefits and SSI or to remand for further proceedings.

1

**BACKGROUND**

**Plaintiff's Personal Background**

Plaintiff is age 41, has a GED and two semesters of college, and has past employment as a cleaner, painter, parts puller, equipment driver and laborer.  (AR 14, 19, 34, 57, 97, 106, 127.)

**Administrative Proceedings**

On August 21, 2002, plaintiff filed his applications for disability insurance benefits and SSI to claim disability since March 10, 1999 based on back and left hand and shoulder pain, headaches and pinched nerve in left shoulder.  (AR 97, 105, 274.)  With its November 20, 2002 Notices of Disapproved Claims, the Social Security Administration ("SSA") denied plaintiff's claims and determined that plaintiff's condition was not disabling on any date through June 2000 when he was last insured for disability benefits.  (AR 77, 278.)

On December 16, 2002, counsel was appointed for plaintiff.  (AR 28.)  On December 20, 2002, plaintiff filed his Request for Reconsideration to claim he is disabled and cannot work.  (AR 81.)  With its February 25, 2003 Notices of Reconsideration, SSA denied plaintiff's claims and again determined that plaintiff's condition was not disabling on any date through June 2000 when he was last insured for disability benefits.  (AR 83, 282.)

On April 10, 2003, plaintiff filed his Request of Hearing by Administrative Law Judge to claim he is disabled and cannot work.  (AR 88.)  After a January 26, 2004 hearing, the ALJ issued his February 23, 2004 decision to conclude that plaintiff is not disabled and has the residual functional capacity to perform a significant range of light work.  (AR 21-22.)

Plaintiff submitted to SSA's Appeals Council his April 14, 2004 Request for Review of Hearing Decision/Order to claim he "cannot perform substantial gainful work."  (AR 10.)  On June 9, 2004, the Appeals Council denied plaintiff's request to render the ALJ's February 23, 2004 decision as the Commissioner's final determination subject to this Court's review.  (AR 6.)

**Medical History And Records Review**

*Richard Vaughan, M.D., Treating Physician*

After a March 10, 1999 on-the-job fall onto his left shoulder, plaintiff treated with Richard Vaughan, M.D. ("Dr. Vaughan"), who on March 12, 1999, assessed that plaintiff had a contusion/strain

2

of his left rhomboid and placed plaintiff off work. (AR 202.) On March 19, 2002, plaintiff reported he was feeling better, experienced muscle spasms and took Ibuprofen. (AR 202.) Dr. Vaughan noted neither swelling, ecchymosis nor palpable deformities. (AR 202.) Dr. Vaughan assessed shoulder contusion, switched plaintiff from anti-inflammatories to samples of Voltaren SR 100 mg and recommended alternating heat and ice and to keep plaintiff off work for a week. (AR 202.) Dr. Vaughan completed a March 31, 1999 form to release plaintiff to work on April 14, 1999 with restrictions to light duty and no lifting. (AR 201.) Dr. Vaughan's March 31, 1999 notes indicate that plaintiff intended to leave work to become a student and to work part time and did not feel comfortable to return to his job. (AR 200.) Dr. Vaughan found neither palpable muscle spasm nor tenderness over rhomboid. (AR 200.) Dr. Vaughan noted plaintiff's good range of motion and "expect him to be back to work." (AR 200.) Dr. Vaughan referred plaintiff to physical therapy and expected plaintiff back to work at his job or at a moderate lifting job. (AR 200.)

### *Michael A. Florio, M.D., Treating Orthopaedist*

Plaintiff treated with Michael A. Florio, M.D. ("Dr. Florio"), an orthopaedist, for his March 10, 1999 left shoulder injury. Dr. Florio completed a June 24, 1999 report to note that plaintiff had sustained a 1987 left clavicle fracture and 1991 left scapula fracture which had healed. (AR 213.) Plaintiff complained his left shoulder hurts "mostly at night." (AR 213.) Dr. Florio's examination revealed neither shoulder tenderness, crepitation nor muscle atrophy. (AR 213.) Dr. Florio assessed a rotator cuff tear of plaintiff's left shoulder to keep plaintiff on temporary total disability. (AR 214.) Dr. Florio recommended an MRI of plaintiff's left shoulder and noted objective findings of abduction weakness of the left shoulder and slight atrophy of the supraspinatus muscle. (AR 214.)

Dr. Florio prepared a March 24, 2000 report to note that plaintiff experienced shoulder pain, was sent to physical therapy and will be fitted with a TENS unit. (AR 211.) Dr. Florio diagnosed postop repair of rotator cuff injury, left shoulder and maintained plaintiff on temporarily total disability. (AR 211.)

Dr. Florio examined plaintiff on April 18, 2000 and prepared a reports of the same date and April 21, 2000. (AR 205, 208.) Plaintiff complained of shoulder soreness with weakness of abduction, inability to work with his arm above shoulder level, and inability to use his left arm for heavy lifting,

1    pushing or pulling.  (AR 206, 208.)  Dr. Florio noted that plaintiff had undergone January 6, 2000

2    surgery to reconstruct his left rotator cuff tear and had attended physical therapy and improved.  (AR

3    205, 208.)  Dr. Florio's examination revealed neither tenderness, crepitation nor muscular atrophy of

4    plaintiff's left shoulder.  (AR 206, 209.)  Dr. Florio assessed plaintiff's condition was permanent and

5    stationary and that plaintiff is unable to work at or above his shoulder with his left arm and to lift more

6    than 25 pounds.  (AR 207, 206, 210.)  According to Dr. Florio, plaintiff's subjective complaints would

7    become slight to moderate if he had to work at or above the shoulder level with his left arm.  (AR 206.)

8    Dr. Florio noted plaintiff's future medical care of anti-inflammatory medications and analgesics and

9    potential benefit from a TENS unit.  (AR 207, 210.)

10                              ***Oscar Hernandez, M.D., Treating Physician***

11            Plaintiff treated with Oscar Hernandez, M.D. ("Dr. Hernandez"), after his March 10, 1999 left

12   shoulder injury resulting from a fall.  On September 8, 1999, Dr. Hernandez assessed plaintiff was

13   temporarily disabled to November 8, 1999.  (AR 256.)  In October 1999, Dr. Hernandez diagnosed

14   plaintiff with a torn rotator cuff and shoulder stain and assessed plaintiff as temporarily disabled to

15   November 8, 1999.  (AR 253-255.)  In an October 18, 1999 report, Dr. Hernandez noted plaintiff was

16   off medicine and could lift his left arm above his shoulder.  (AR 253, 254.)  Dr. Hernandez referred

17   plaintiff to Dr. Florio for rotator cuff surgery.  (AR 253, 254.)  In a November 3, 1999 report, Dr.

18   Hernandez noted plaintiff was "not taking the medicines not covered by the insurance." (AR 252.)  Dr.

19   Hernandez extended to December 18, 1999 plaintiff's temporary disability.  (AR 252.)  Dr. Hernandez'

20   treatment plan included Tylenol and an upcoming surgery.  (AR 252.)  In his November 16, 1999 report,

21   Dr. Hernandez noted that medications helped plaintiff and that plaintiff slept better.  (AR 249.)  Dr.

22   Hernandez kept plaintiff off work to December 18, 1999.  (AR 249.)  In his December 3, 1999 report, Dr.

23   Hernandez noted that medications help and that plaintiff sleeps better.  (AR 251.)  Dr. Hernandez

24   continued plaintiff off work to February 1, 2000.  (AR 251.)  In his December 9, 1999 report, Dr.

25   Hernandez noted that plaintiff suffered severe left shoulder pain after hearing a popping sound when

26   playing with plaintiff's son.  (AR 250.)  Dr. Hernandez noted plaintiff's Vicodin prescription and

27   upcoming rotator cuff surgery.  (AR 250.)  Dr. Hernandez again continued plaintiff off work to February

28   1, 2000.  (AR 250.)

In his February 13, 2000 report, Dr. Hernandez noted that plaintiff wore a sling after his January 6, 2000 left shoulder surgery and that Vicodin upset plaintiff's stomach. (AR 248.) In his July 10, 2000 report, Dr. Hernandez noted that plaintiff is unable to lift more than 10 pounds and to reach above the shoulder level with his left arm. (AR 247.) On July 18, 2000, Dr. Hernandez noted plaintiff's shoulder, neck and back pain and addition of Vicodin. (AR 246.) Dr. Hernandez found plaintiff, with his left arm, was unable to lift more than 10 pounds and to reach above his shoulder. (AR 246.) In his August 10, 2000 report, Dr. Hernandez noted that plaintiff's left shoulder and neck hurt, that medication helped, and that plaintiff "needs work rehab." (AR 245.) On September 11, 2000, Dr. Hernandez noted that plaintiff's left shoulder and neck hurt and that plaintiff should not lift above his shoulder since "it hurts." (AR 244.) According to Dr. Hernandez, plaintiff "needs work rehab" and has permanent restrictions not to lift more than 10 pounds and no reaching above shoulder with his left arm. (AR 244.) On October 1, 2000, Dr. Hernandez noted plaintiff's increased left shoulder pain, crepitis and fair range of motion. (AR 243.) Dr. Hernandez again precluded plaintiff from lifting more than 10 pounds with no reaching above the shoulder with his left arm. (AR 243.) On December 17, 2000, Dr. Hernandez noted plaintiff's persistent left scapula pain and "medicines doing ok." (AR 242.) Dr. Hernandez noted no strength in elevating plaintiff's left shoulder and need for an orthopedic surgical reevaluation. (AR 242.) Dr. Hernandez again continued his restrictions of no lifting more than 10 pounds and no left arm reaching above the shoulder. (AR 242.)

Dr. Hernandez' January 12, 2001 report notes plaintiff's left shoulder and neck pain and medication causing gastrointestinal upset, for which Tagamet was started. (AR 241.) On January 22, 2001, Dr. Hernandez reported plaintiff's severe pain from perhaps sleeping on his shoulder and prescribed Vicodin. (AR 240.) Dr. Hernandez restricted plaintiff from lifting more than 10 pounds and reaching above his shoulder with his left arm. (AR 240.) On February 13, 2001, Dr. Hernandez noted plaintiff's inability to engage in normal left shoulder activities, persistent pain and stomach improvement. (AR 239.) Dr. Hernandez continued his restrictions of lifting no more than 10 pounds and no reaching above the shoulder with plaintiff's left arm. (AR 239.) On March 31, 2001, Dr. Hernandez noted plaintiff's tender left shoulder and left hand difficulties. (AR. 238.) Dr. Hernandez maintained his restrictions of lifting no more than 10 pounds and no reaching above the shoulder with

plaintiff's left arm. (AR 238.) Dr. Hernandez completed March 18, 2001 Job Analysis Physician Review Forms to note that plaintiff is limited to lift 10 pounds and not above the shoulder. (AR 221.) In his April 13, 2001 report, Dr. Hernandez again restricted plaintiff to lifting no more than 10 pounds and no lifting above the shoulder with his left arm. (AR 237.)

### *Hal D. McConnaughey, M.D., Consultative Orthopaedist*

Hal D. McConnaughey, M.D. ("Dr. McConnaughey"), conducted an August 23, 2001 consultative medical examination of plaintiff, who complained that his shoulder pain worsened, he experiences a feeling of heaviness in his left shoulder, his left finger joints stay sore, and he "can hardly lift anything with his left arm." (AR 258.) Dr. McConnaughey's physical examination revealed left hand grip strength of 60, 80 and 80 pounds. (AR 259.) Dr. McConnaughey found plaintiff's condition permanent and stationary and explained:

> Complaints of aching pain in the left shoulder which would be considered minimal or annoying for activities of daily living and would be expected to increase into the moderate range with use of the left upper extremity at or above shoulder level or even to severe (indicating inability to perform the activity) if moderate (i.e. greater than 20 pounds) lifting with the left arm in the overhead position were required. (AR 260.)

### *Sequoia Family Medical Center*

Plaintiff treated at Sequoia Family Medical Center and was seen by Jack Gregory, M.D. ("Dr. Gregory"). On October 8, 2001, complained of a laceration to his left index finger when skinning a deer. (AR 162.) Dr. Gregory treated plaintiff with Neosporin. (AR 162.) A March 13, 2002 abdomen x-ray revealed a deformity to the right iliac bone but neither obstruction nor acute process. (AR 161.) On March 15, 2002, plaintiff complained of headaches and a rash on his abdomen. (AR 157.) On March 19, 2002, plaintiff reported feeling well. (AR 154.) On June 21, 2002, plaintiff complained of a cough, sore throat and stuffy nose. (AR 153.) On October 31, 2002, plaintiff complained of cough on left side and was assessed with left shoulder pain. (AR 199.) November 5, 2002 medical imaging of plaintiff's thoracic spine series revealed:

> Mild anterior wedge compression fractures are present of vertebral bodies T9, 10 and 11 with surrounding osteophytes which appear old. The remainder of the vertebral body heights and alignment are normal. Intervertebral disc spaces are normal. Osteoarthritic change of the thoracic spine is present with osteophyte formation and sclerosis of the apophyseal joints. (AR 198.)

November 5, 2002 medical imaging of plaintiff's left shoulder revealed: (1) post-traumatic deformity

of the left mid clavicle and left glenoid rim consistent with old healed fractures; (2) no acute fractures or dislocations; and (3) normal joint space and soft tissues.  (AR 197.)

On November 14, 2002, plaintiff complained of left shoulder and back pain.  (AR 196.)  Dr. Gregory assessed compression fractures of thoracic spine and arthritic thoracic spine.  (AR 196.) November 14, 2002 medical imaging of plaintiff's left shoulder revealed: (1) post-traumatic deformity of the left mid clavicle and left glenoid rim consistent with old healed fractures; (2) no acute fractures or dislocations; (3) normal joint space and soft tissues; and (4) no interval change compared with November 5, 2002 examination.  (AR 195.)  On November 22, 2002, plaintiff complained of left shoulder pain.  (AR 192.)  On November 26, 2002, plaintiff complained of left earache and nasal drainage.  (AR 191.)

On March 6, 2003, plaintiff complained of appetite loss and was assessed with Gastroesophagal Reflux Disease "(GERD") and peptic ulcer disease.  (AR 190.)  A March 7, 2003 MR scan of plaintiff's lumbar spine revealed a broad based three millimeter lumbar disc protrusion with moderate right neural foraminal stenosis and mild to moderate L4 sided ganglionic compression.  (AR 189.)  On April 9, 2003, plaintiff complained of worsening pain running the length of his back.  (AR 187.)  On May 22, 2003, plaintiff complained of abdominal pain and was assessed with GERD.  (AR 186.)  On June 19, 2003 and November 4, 2003, plaintiff continued to complain of back pain, and Dr. Gregory assessed GERD and herniated disc.  (AR 268.)  A November 4, 2003 chest x-ray revealed chronic obstructive pulmonary disease with neither acute infiltrates, interstitial edema nor effusions.  (AR 267.)  On December 31, 2003, Dr. Gregory assessed disc herniation, GERD and chest pain.  (AR 265.)  On January 6, 2004, plaintiff complained of constant neck pain, and Dr. Gregory assessed herniated disc and GERD and treated with Vicodin.  (AR 264.)

### *Vinay K. Buttan, M.D., Consultative Internist*

Vinay K. Buttan, M.D. ("Dr. Buttan"), a board certified internist, conducted an October 25, 2002 consultative examination of plaintiff, who complained chiefly of left shoulder pain and upper back pain. (AR 165.) Dr. Buttan noted plaintiff's history of repeated left shoulder fractures for which plaintiff takes Tylenol and right eye blindness from a hit to plaintiff's head.  (AR 165.)  Dr. Buttan's examination revealed tenderness in the left scapular area at the back and left shoulder.  (AR 166.)  Plaintiff claimed

1   that pain prevented him to raise his left arm.  (AR 166.)  Dr. Buttan assessed persistent pain in the left

2   shoulder and left scapular area from prior injury and right eye blindness due to head injury causing optic

3   nerve damage.  (AR 166.)  Dr. Buttan concluded:

> In my opinion in an 8-hour day he should be able to sit for about 4 hours with normal
> break, stand for about 3 to 4 hours with normal break, and walk for about 3 hours with
> normal break.  Because of pain, he may not be able to use his left arm much.  He can
> only use it minimally but the right arm should not be any problem.  (AR 166.)

### *Physical Residual Functional Capacity Assessment*

8   Ernest Wong, M.D. ("Dr. Wong"), prepared a November 20, 2002 Physical Residual Functional

9   Capacity Assessment to conclude that plaintiff is able to: (1) lift/carry 20 pounds occasionally and 10

10  pounds frequently; (2) stand/walk about six hours in an eight-hour workday; (3) sit about six hours in

11  an eight-hour workday; (4) frequently climb ramps and stairs, stoop, kneel, crouch and crawl; and (5)

12  occasionally climb ladders, ropes and scaffolds.  (AR 169, 170.)  Dr. Wong found plaintiff is limited in

13  reaching with his left upper extremity and in work requiring precise binocular vision.  (AR 171.)  Dr.

14  Wong found neither communicative nor environmental limitations, except to avoid concentrated

15  exposure to hazards.  (AR 172.)  Dr. Wong noted that plaintiff's gait and strength are normal and that

16  plaintiff lacks neurological deficits or deformities.  (AR 183.)

17  As of February 24, 2003, Carmen E. Lopez, M.D. ("Dr. Lopez"), affirmed SSA's initial residual

18  functional capacity assessment that plaintiff could perform light work.  (AR 176.)

### *Diagnostic Imaging*

20  A March 11, 2003 MR scan of plaintiff's thoracic spine revealed mid thoracic disc protrusion

21  and neither vertebral body compression fracture nor spondylolisthesis.  (AR 185.) March 26, 2003 digital

22  imaging of plaintiff's thoracic spine revealed "very mild bulging of the disc at the T9-10 level" and

23  "small thoracic disc protrusion T6-7 without major impingement upon the thoracic cord."  (AR 184.)

### *Shahram Ehteshami, M.D., Consultative Neurologist*

25  Shahram Ehteshami, M.D. ("Dr. Ehteshami"), conducted a consultative neurological examination

26  and prepared a June 3, 2003 report to note his normal neurological examination and recommendations

27  to avoid surgical intervention and "conservative measures . . . such as physical therapy, NSAIDS with

28  the precautions and no heavy lifting, pulling or pushing and no repetitive bending or twisting."  (AR

263.)

### *Residual Functional Capacity Questionnaire*

Dr. Gregory completed a January 6, 2004 Residual Functional Capacity Questionnaire to note a diagnosis of herniated cervical disc and GERD with a guarded prognosis. (AR 269.) Dr. Gregory noted plaintiff's symptoms of pain and numbness to neck, arms and lower back due to impingement on nerves in light of an MRI positive for herniation. (AR 269-270.) Dr. Gregory assessed that plaintiff's pain is severe enough to constantly interfere with attention and concentration for simple work tasks. (AR 270.) Dr. Gregory estimated plaintiff can maintain attention and concentration for 15 minutes at one time. (AR 270.) According to Dr. Gregory, plaintiff is incapable of even "low stress" jobs. (AR 271.) Dr. Gregory assessed that plaintiff: (1) is unable to walk a city block without rest or severe pain; (2) is able to sit for 15 minutes at one time; (3) is able to stand for 15 minutes at one time; (4) is able to sit or stand/walk less than two hours in an eight-hour workday; (5) must walk every 15 minutes for five minutes during an eight-hour day; (6) is unable to lift/carry 10 pounds; (7) is unable to look down, turn head right or left, look up and hold head in static position; (8) is unable to twist, stoop, crouch and climb ladders and stairs; (9) has significant limitations in doing repetitive reaching, handling or fingering; and (10) has "no relief from pain whatsoever"; and (11) would be absent from work more than four days per month. (AR 270-273.) Dr. Gregory concluded that plaintiff's degree of pain from his herniated disc prevents "functional work." (AR 273.)

### *Medications*

Plaintiff's medications have included Ibuprofen 200 mg, Methocarbanol, Cyclobenzaprine, Celebrex, Acetaminophen, Cimetidine, Vicodin, Prevacid 30 mg and Tylenol. (AR 110, 147.)

### **Plaintiff's Activities And Testimony**

### *Plaintiff's Reports And Questionnaires*

Plaintiff completed an August 19, 2002 Disability Report Adult to note that he stopped working on March 10, 1999 after suffering a broken left shoulder from a fall. (AR 105.)

Plaintiff completed an August 21, 2002 Work Activity Report – Employee to noted that during early 2002, he worked 5-6 hours per week performing residential painting but quit because he could not work fast enough. (AR 118.)

1    Plaintiff completed a September 1, 2002 Exertional Daily Activities Questionnaire to note that

2    he lives with his children, experiences pain performing "daily needs," and requires his children's help

3    to clean his home and to grocery shop. (AR 135, 136.) Plaintiff drives his children to school each day

4    and enjoys country drives and reading. (AR 136.) Plaintiff likes to change his truck's oil but

5    experiences difficulty getting under the truck. (AR 137.) Plaintiff naps every day, and pain causes sleep

6    difficulty at night. (AR 137.) Plaintiff has used a sling for his left shoulder but no other assistive device.

7    (AR 137.)

8    In his December 16, 2002 Reconsideration Disability Report, plaintiff noted his worsened pain,

9    decreased range of motion, and difficulty lifting, standing and walking. (AR 138.) Plaintiff does things

10   "slowly" and "even less now than before." (AR 140.)

11   In a March 7, 2003 statement, plaintiff noted that his pain had worsened, his activities had

12   lessened, and he had gained 20 pounds due to inactivity. (AR 144.)

13                                      ***Plaintiff's ALJ Hearing Testimony***

14   At the January 26, 2004 ALJ hearing, plaintiff testified that he last worked as a parts puller for

15   an auto wrecker where he tore apart automobiles and was required to lift heavy weight. (AR 34, 36.)

16   Plaintiff has not worked since March 10, 1999 when he fell from the third of three stacked cars and

17   landed on his back. (AR 34, 41.) Prior to working for the auto wrecker, plaintiff worked driving a front-

18   end loader and operating a rock crusher which was "heavy-duty work" requiring plaintiff to lift 15 to 150

19   pounds. (AR 35.) Prior to that employment, plaintiff worked at a newspaper pressroom where he pulled

20   bundles of newspapers off presses, stacked the bundles and cleaned presses. (AR 36.) Plaintiff was on

21   his feet most of the time during his pressroom job. (AR 37.) Prior to the pressroom job, plaintiff

22   performed detail cleaning at Louis Rich requiring plaintiff to lift a 25-pound hose. (AR 37, 38.) Prior

23   to the Louis Rich job, plaintiff worked as a house painter which required painting, scraping, and putting

24   up scaffolding and ladders. (AR 39.)

25   Since March 10, 1999, plaintiff tried to perform a paint job which required two weeks but should

26   have been completed in a couple of days. (AR 40-41.) Plaintiff earned $1,000. (AR 41.)

27   Plaintiff's March 10, 1999 fall affected his back with more pain to his left shoulder. (AR 42.)

28   Plaintiff had surgery for a rotator cuff tear. (AR 42.) Plaintiff is unable to grasp a gallon of milk or

1    pound a hammer with his left hand.  (AR 43, 44.)  Plaintiff is right-handed.  (AR 43.)  Plaintiff is blind

2    in his right eye from optical nerve damage.  (AR 42.)

3          Plaintiff experiences neck and lumbar pain.  (AR 44.)  Plaintiff's lower back pain is constant.

4    (AR 44.)  Vicodin helps plaintiff to sleep and to tolerate the pain.  (AR 45.)  Vicodin makes plaintiff's

5    "head kind of cloudy" and his stomach upset if he does not take it with food.  (AR 45.)  Vicodin affects

6    plaintiff's concentration.  (AR 46.)  Plaintiff takes Vicodin at night and during the day would "rather sit

7    in pain than be around my kids and be like in a cloud."  (AR 46.)

8          Plaintiff had treated with Dr. Gregory for more than a year prior to the ALJ hearing.  (AR 46-47.)

9    Plaintiff sees Dr. Gregory monthly, and Dr. Gregory gives plaintiff medication.  (AR 47.)  Dr. Ehteshami

10   told plaintiff there was no surgery he could perform.  (AR 47.)

11         Plaintiff lives with daughter and son who were ages ten and eight respectively at the time of the

12   hearing.  (AR 46.)  Plaintiff does the cooking and laundry, and his daughter performs the other

13   household chores, including mopping.  (AR 47, 48.)  Plaintiff is unable to mow the lawn, vacuum, and

14   other "hard stuff."  (AR 48.)  Plaintiff is able to pick up a bundle of laundry and place it in the washing

15   machine.  (AR 49.)  Plaintiff could not lift a gallon of milk for two to three hours in an eight-hour shift

16   because of his lower back pain.  (AR 49.)  Plaintiff is able to sit for 15-20 minutes before needing to

17   walk around.  (AR 49.)  Plaintiff is able to stand for 10 minutes before needing to sit down.  (AR 50.)

18   Plaintiff is unable to sit or stand for an hour during an eight-hour workday, even with breaks.  (AR 54,

19   57.)  Plaintiff is able to lift up to ten pounds and carry up to five pounds.  (AR 58.)

20         Plaintiff spends most of his time reclined.  (AR 54.)  Plaintiff watches television for 20-30

21   minutes, gets up and stretches and sits back down.  (AR 50.)  When plaintiff sits on a couch, he positions

22   sleeping bags and pillows and elevates his legs.  (AR 51.)  Plaintiff must recline with his legs elevated

23   all day.  (AR 51.)  Plaintiff takes his children to school and usually watches television until he picks up

24   his children from school and fixes dinner.  (AR 51, 59.)  Plaintiff sits in a chair when fixing dinner.  (AR

25   51.)  Plaintiff is unable to bend the first joint of his left thumb.  (AR 53.)

26         Plaintiff enjoys country drives with his children once a month.  (AR 54, 59.)  They go to a place

27   near a river, and plaintiff sits in his pick up truck's bed with pillows.  (AR 54.)

28         Plaintiff claims he has been physically restricted as he described since his March 10, 1999 injury.

(AR 56.)  Plaintiff was an avid hunter prior to his injury and is unable to shoot guns.  (AR 56.)  In October 2001, plaintiff lacerated his finger at a deer skinning party where helped to skin a deer.  (AR 61.)

### Testimony Of Vocational Expert Cheryl Chandler

Vocational expert Cheryl Chandler ("Ms. Chandler") testified at the January 26, 2004 ALJ hearing to categorize plaintiff's prior work to include heavy semiskilled, medium semiskilled, heavy unskilled, medium unskilled, and medium skilled. (AR 63.) As a first hypothetical, the ALJ asked Ms. Chandler to assume a person who: (1) is age 39; (2) has a GED with some college credits; (3) has past relevant work experienced as Ms. Chandler categorized for plaintiff's past work; (4) has a combination of severe impairments and retains a residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently; (5) has ability to stand, walk and sit six hours; (6) is able to occasionally reach overhead with the left upper non-dominant extremity; (7) is able to occasionally perform tasks requiring binocular vision; and (8) must avoid exposure to unprotected heights and operation of motor vehicles. (AR 64.) Given the limitations, Ms. Chandler opined that such individual cannot perform plaintiff's past work.  (AR 64.)  Ms. Chandler further opined that such individual could perform other jobs in the national economy, including cashier (75,000 jobs in California), telemarketer (10,000 jobs in California), and assembly worker (40,000 jobs in California). (AR 64-65.) Ms. Chandler estimated roughly 10 times those number of jobs exist in the national economy.  (AR 65.)

As a second hypothetical, the ALJ asked Ms. Chandler to assume a person with the same vocational prime as in the first hypothetical and who: (1) has a combination of severe impairments; (2) retains the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently; and (3) is unable to reach over the shoulder with non-dominant left extremity more than 20 pounds. (AR 65.)  Ms. Chandler opined that such individual cannot perform plaintiff's past work.  (AR 65.)  Ms. Chandler further opined that such individual could perform the same jobs in the same numbers in her response to the first hypothetical.  (AR 65-66.)

As a third hypothetical, the ALJ asked Ms. Chandler to assume a person with the same vocational parameters of the first two hypotheticals and who: (1) has a combination of severe impairments; (2) retains the residual functional capacity to stand, walk and sit less than two hours; (3) is required to walk

five minutes every 15 minutes; (4) is unable to lift 10 pounds; (5) is unable to flex or extend the neck; (6) is unable to twist, stoop, crouch or climb; (7) is limited to occasional reaching; (8) would be absent from work four days per month; (9) is able to maintain attention and concentration for 15 minutes at a time; and (10) cannot tolerate low stress jobs.  (AR 66.)  Ms. Chandler opined that such individual could perform neither plaintiff's past relevant work nor other jobs that exist in the national economy.  (AR 66-67.)  Plaintiff's attorney asked Ms. Chandler for a clarification to assume the person could sit, stand or walk less than two hours in an eight-hour day.  (AR 67.)  Ms. Chandler opined such person could neither perform plaintiff's past relevant work nor other work in the national economy.  (AR 67.)

### ALJ's Findings

In his February 23, 2004 decision, the ALJ identified the specific issue whether plaintiff is under a disability, which is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  (AR 14.)  In concluding that plaintiff is able to adjust to work that exists in significant numbers in the national economy and is ineligible for disability insurance benefits and SSI, the ALJ found:

1. Plaintiff's degenerative disc disease of the thoracic spine with low back pain, post repair of left rotator cuff tear with left shoulder pain, and right eye blindness are severe but do not meet or medically equal an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

2. Plaintiff's allegations regarding his limitations are not totally credible.

3. Plaintiff has the residual functional capacity to: (a) frequently lift/carry 10 pounds and occasionally 20 pounds; (b) stand and walk six hours in an eight-hour workday; (c) sit six hours in an eight-hour workday; (d) only occasionally reach overhead with non-dominant left upper extremity; and (e) only occasionally perform tasks requiring binocular vision.  Plaintiff should avoid all exposure to unprotected heights and operation of motor vehicles.

4. Plaintiff is unable to perform his past relevant work.

5. Plaintiff has the residual functional capacity to perform a significant range of light work.

1      6.      Using Rule 202.21 of the Medical-Vocational Guidelines, 20 C.F.R., Part 404, Subpart

2             P, Appendix 2 ("Medical-Vocational Guidelines"), there is a significant number of jobs

3             in the national economy that plaintiff could perform, including cashier (75,000 jobs in

4             California and 750,000 nationally), telemarketer (10,000 jobs in California and 100,000

5             nationally), and assembler (40,000 jobs in California and 400,000 nationally).  (AR 21.)

**DISCUSSION**

**Standard of Review**

Congress has provided limited judicial review of a Commissioner's decision made through an ALJ.  *See* 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ, when the determination is not based on legal error and is supported by substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work contrary to treating physician's findings).[1]  Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

The record as a whole must be considered, weighing both the evidence that supports and detracts from the Commissioner's conclusion.  *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is substantial evidence to support the administrative finding, or if there is conflicting evidence that will support a finding of either disability or nondisability, the finding of the Commissioner is conclusive.  *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner.  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999).

---

[1]    "The district court properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards."  *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

1    This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it

2    is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

3    whole. *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988). "A decision of the ALJ will not be

4    reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

5    Plaintiff bears the burden to prove that she is disabled which requires presentation of "complete

6    and detailed objective medical reports of her condition from licensed medical professionals." *Meanel*

7    *v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)).

8    Plaintiff must furnish medical and other evidence about plaintiff's medical impairments. 20 C.F.R. §§

9    404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind

10   or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine

11   whether you are disabled or blind. You are responsible for providing that evidence.")

12   Here, plaintiff claims disability since March 10, 1999 based on left hand and shoulder pain and

13   back pain. (AR 97, 105, 274.) As discussed below, this Court finds that the ALJ properly evaluated the

14   evidence and that his conclusion that plaintiff is not disabled is based on proper legal standards and

15   substantial evidence.

16   **Evaluation Of Physician Opinions**

17   Dr. Gregory completed a January 6, 2004 Residual Functional Capacity Questionnaire to

18   conclude the degree of pain from plaintiff's herniated disc prevents plaintiff to perform "functional

19   work." (AR 273.) Plaintiff contends that the "case should be remanded for an updated consultative

20   examination that considers all of the objective studies" and "should also be remanded to give greater

21   weight to the opinion of Dr. Gregory who had all of the adequate studies, was 'familiar with the other

22   information' in his case file, and had a chance to know and treat the claimant." The Commissioner

23   responds that the ALJ properly rejected Dr. Gregory's opinion based on exaggerated findings

24   unsupported by the record.

25   A treating physician's opinion is not conclusive as to a claimant's physical condition or the

26   ultimate issue of disability and may be disregarded by the ALJ even when it is not contradicted.

27   *Rodriquez v. Bowen*, 876 F.2d 759, 761-762, n. 7 (9th Cir. 1989); *Magallanes v. Bowen*, 881 F.2d 747,

28

751 (9th Cir. 1989); *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).[2]  An ALJ may reject a

treating physician's opinion whether or not it is contradicted, if the opinion is "brief and conclusory in

form with little in the way of clinical findings to support its conclusion." *Magallanes,* 881 F.2d at 751.

Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute

specific, legitimate reasons to reject the opinion. *Matney,* 981 F.2d at 1020.

The Ninth Circuit has further explained:

> To reject the opinion of a treating physician which conflicts with that of an examining physician, the ALJ must "'make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" . . . "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." . . . The rule . . . does not apply, however, "when the nontreating physician relies on independent clinical findings that differ from the findings of the treating physician." . . . "'[T]o the extent that [the nontreating physician's] opinion rests on objective clinical tests, it must be viewed as substantial evidence . . .'"

*Magallanes*, 881 F.2d at 751(citations omitted.)

An ALJ may reject a treating physician's report based on a claimant's exaggerated claims. *See,*

*e.g., Sandgathe*, 108 F.3d at 980.  A physician's opinion of disability "premised to a large extent upon

claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints

have been "properly discounted." *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citing *Brawner v.*

*Sec. of Health & Human Servs.*, 839 F.2d 432, 433-434 (9th Cir. 1988)); *see Saelee v. Chater*, 94 F.3d

520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113, 117 S.Ct. 953 (1997) ("no physician has been able

to find a link between [claimant's] complaints and known medical pathologies").

"[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical

testimony, and for resolving ambiguities." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute

specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

After reviewing the medical evidence, the ALJ explained his rejection of Dr. Gregory's

limitatios:

---

[2]    A treating physician's opinion is not conclusive as to claimant's disability as this ultimate issue is an administrative finding reserved to the Commissioner.  20 C.F.R. § 404.1527(e).  The Commissioner has final responsibility to determine a claimant's residual functional capacity.  20 C.F.R. § 404.1546.

The claimant alleged severe functional limitations, but there is no reliable medical basis. Contrary to Dr. Gregory's assessment and claimant's testimony that he is capable of less than sedentary exertion, he has normal daily activities. He cares for two school age children by himself and shoulders all responsibilities of managing a household. He successfully obtained a worker's compensation settlement of $30,000. It is important to note the claimant was treated for a laceration of the index finger on his left hand sustained while skinning a deer in October 2001 (Exhibit 1F, p. 11), however, the claimant incredibly testified he last hunted deer in May 1999.

. . .Treating Physician, Dr. Gregory's opinion that the claimant is precluded from performing even sedentary work (Exhibit 15F, pp. 1 through 4), is rejected, as the prevailing diagnosis is "disc protrusion" in all instances, not "herniated discs." Moreover, Dr. Gregory is a general practitioner, not a neurosurgeon or orthopedic specialist. (AR 18-19.)

Although disc protrusion was the prevailing diagnosis of plaintiff's objective tests, Dr. Gregory extrapolated to herniated discs. Dr. Gregory's assessment is unsupported by the record as a whole or by objective medical findings. *See Batson v. Commissioner of Social Security Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). November 5, 2002 medical imaging of plaintiff's thoracic spine series revealed mild anterior wedge compressions fractures which appear old and osteoarthritic change of the thoracic spine. (AR 198.) A March 7, 2003 MR scan of plaintiff's lumbar spine revealed a broad based three millimeter lumbar disc protrusion with moderate right neural foraminal stenosis and mild to moderate L4 sided ganglionic compression. (AR 189.) A March 11, 2003 MR scan of plaintiff's thoracic spine revealed mid thoracic disc protrusion and neither vertebral body compression fracture nor spondylolisthesis. (AR 185.) March 26, 2003 digital imaging of plaintiff's thoracic spine revealed "very mild bulging of the disc at the T9-10 level" and "small thoracic disc protrusion T6-7 without major impingement upon the thoracic cord." (AR 184.)

The objective medical findings fail to support Dr. Gregory's sweeping assessment. As noted by the Commissioner, the objective evidence on which plaintiff relies demonstrates mild abnormalities and old or healed injuries. Plaintiff's subjective complaints fail to properly support Dr. Gregory's extreme limitations. *See Fair*, 885 F.2d at 605 (A physician's disability opinion "premised to a large extent upon claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints have been "properly discounted.") The clinical findings of Dr. Gregory's treatment notes fail to support his severe limitations. *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (Treatment notes "are not the sort of description and recommendations one would expect to accompany a finding that

17

[claimant] was totally disabled under the Act.") Moreover, Dr. Gregory's findings are inherently inconsistent in that he notes plaintiff is unable to walk a city block yet must walk every 15 minutes for five minutes.  (AR 270-273.)

Plaintiff's activities contradict Dr. Gregory's severe limitations.  Plaintiff acknowledged that he performed residential painting, drives his children to school each day and on country drives, changes his truck's oil, does laundry and cooking, including his children's nightly dinner, watches television, and participated in a deer skinning.  (AR 40, 41, 47, 48, 51, 59, 54, 61, 118, 135, 136.)  Such activities are inconsistent with Dr. Gregory's severe restrictions, especially purported inability to twist, stoop, crouch, look down, turn head, hold head in static position, or perform repetitive reaching, handling or fingering.

In addition, Dr. Gregory is a general practitioner, not an orthopedic or neurological specialist. Generally more weight is given to opinions of specialists as to matters relating to their specialty over those of nonspecialists.  *See* 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5).  Neither Dr. Florio, a treating orthopaedist, nor Dr. McConnaughey, a consultative orthopedist, assessed severe limitations such as those of Dr. Gregory, who did not meaningfully address plaintiff's left shoulder.  Plaintiff fails to substantiate ALJ error in evaluation of Dr. Gregory's assessment or reliance on the opinions of Dr. Florio and Dr. McConnaughey given Dr. Gregory's unsupported views and despite Dr. Florio and Dr. McConnaughey's earlier evaluations.  Moreover, plaintiff fails to demonstrate how recent diagnostic imaging warrants a further Physical Residual Functional Capacity Assessment from a state agency physician.

Plaintiff argues that the ALJ erred by failing to state whether he rejects Dr. Buttan's opinion. According to plaintiff, the ALJ "obviously rejects [Dr. Buttan's] report as the ALJ finds that the claimant can stand and walk 6 hours in an 8 hour day and sit 6 hours in an 8 hour day."  The ALJ summarized Dr. Buttan's evaluation and referenced portions of it to discredit plaintiff's allegations.  (AR 16, 18.)  The Commissioner notes that the ALJ did not reject Dr. Buttan's opinion in that the ALJ accepted a left arm limitation similar to Dr. Buttan's.  (AR 21.)  Plaintiff points to no meaningful error in the ALJ's

/ / /

/ / /

/ / /

1

2    handling of Dr. Buttan's assessment in that "[i]t is not necessary to agree with everything an expert

3    witness says in order to hold that his testimony contains 'substantial evidence.'" *Russell v. Bowen*, 856

4    F.2d 81, 83 (9th Cir. 1988).

5                                    **Plaintiff's Credibility**

6           Plaintiff argues that the ALJ erred in failing to consider plaintiff's persistent efforts to obtain

7    relief to enhance his credibility.  The Commissioner responds that the ALJ properly assessed factors to

8    test plaintiff's credibility.

9                "Credibility determinations are the province of the ALJ." *Fair*, 885 F.2d at 604; *Russell*,

10   856 F.2d at 83.  "An ALJ cannot be required to believe every allegation of disabling pain." *Fair*, 885

11   F.2d at 603. An ALJ "may disregard unsupported, self-serving statements." *Flaten v. Secretary of*

12   *Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir. 1995).  "If the ALJ finds that the claimant's

13   testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility

14   determination with findings sufficiently specific to permit the court to conclude that the ALJ did not

15   arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).  If

16   an ALJ's credibility finding is supported by substantial evidence in the record, a reviewing court may

17   not engage in second-guessing. *Thomas*, 278 F.3d at 959.  A reviewing court will not reverse an ALJ's

18   credibility determinations "based on contradictory or ambiguous evidence." *Johnson v. Shalala*, 60 F.3d

19   1428, 1434 (9th Cir. 1995) (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)).  "So long as the

20   adjudicator makes specific findings that are supported by the record, the adjudicator may discredit the

21   claimant's allegations based on inconsistencies in the testimony or on relevant character evidence."

22   *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991).

23          In *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), the Ninth Circuit commented:

24   In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness,
     inconsistencies either in his testimony or between his testimony and his conduct, his
25   daily activities, his work record, and testimony from physicians and third parties
     concerning the nature, severity, and effect of the symptoms of which he complains.
26   *Smolen*, 80 F.3d at 1284; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting
     *Orteza v. Shalala*, 50 F.3d 748, 749-50 (9th Cir. 1995)); 20 C.F.R. § 404.1529(c).  An
27   ALJ's finding that a claimant generally lacked credibility is permissible basis to reject
     excess pain testimony.

28

                                            19

1  *See also* S.S.R. 96-7p.[3]

2  An ALJ may consider the following factors to determine the credibility of a claimant's

3  allegations of disabling pain:

4      1.    The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

5      2.    Precipitating and aggravating factors (e.g., movement, activity, environmental

6          conditions);

7      3.    Type, dosage, effectiveness, and adverse side-effects of any pain medication;

8      4.    Treatment, other than medication, for relief of pain;

9      5.    Functional restrictions;

10      6.    Claimant's daily activities;

11      7.    Unexplained, or inadequately explained, failure to seek treatment or to follow up a

12          prescribed course of treatment; and

13      8.    Ordinary techniques to test a claimant's credibility.

14  *Bunnell*, 947 F.2d at 346; *see* 20 C.F.R. §§ 404.1529, 416.929.

15  After reviewing in detail the medical evidence, the ALJ assessed plaintiff's credibility:

16  The claimant's allegations are not as limited as he alleges. While the claimant has left
17  shoulder pain with forward elevation, there is no clinical or x-ray evidence supporting
   chronic and disabling musculoskeletal pain disorder. There is no evidence of an inability
18  to ambulate or manipulate effectively. In October 2002, Dr. Buttan, Consultative
   Examiner, noted some tenderness in the left scapular and the back; however, there were
19  not focal deficits. He observed the claimant had a normal gait. He said grip strength was
   adequate (Exhibit 2F, p. 2). Objectively, Dr. Ehteshami, Examining Physician,
20  performed a normal neurological examination (Exhibit 13F, pp. 1 and 2). An MRI scan
   evidenced a small disc protrusion, but no major impingement on the thoracic cord
21  (Exhibit 4F, p 1).

22  In October 2002, Dr. Buttan also noted the claimant was taking an over-the-counter pain
   medication (Exhibit 2F, p. 1), inconsistent with chronic, debilitating pain. The claimant
23  currently is taking Vicodin, an opioid analgesic . . . However, the claimant testified his
   medication was effective in relieving pain and inducing sleep. Other than medication,
24  he has not used other measures to relieve his pain, e.g., ice, heat, exercise or topical

25         [3]    Social Security Ruling 96-7p sets out factors to assess a claimant's credibility: (1) claimant's daily
   activities; (2) location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate
26  and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication the claimant takes or has
   taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief
27  of pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other
   symptoms (e.g., lying flat on his or her back, standing 15 to 20 minutes every hour, or sleeping on a board); and (7) any other
28  factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

1   analgesics.  He does not wear a lumbar support or use a cane to ambulate.  The claimant
2   has received some physical therapy of his left shoulder postoperatively with
    improvement in his pain.  He has not sought last resort alternative medicine therapies,
3   i.e., medical massage, acupuncture, biofeedback or chronic pain management. (AR 18.)

4           The ALJ made sufficiently specific findings regarding plaintiff's credibility to demonstrate that

5   the ALJ did not arbitrarily discredit plaintiff.  The ALJ's findings are supported by the record in that the

6   ALJ noted the absence of clinical or x-ray evidence to support plaintiff's alleged pain.  The record fails

7   to indicate significant atrophy or muscle loss to support plaintiff's claims of inability to use his left arm.

8   The detailed medical evidence contradicts plaintiff's claims of severe limitations.  Medical evidence is

9   "a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins*

10  *v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1998)

11  (the medical evidence suffices as "specific, clear, and convincing reasons" to discredit pain claims);

12  *Roberts v. Shalala*, 66 F.3d 179, 183 (9th Cir. 1995), *cert. denied*, 517 U.S. 1122, 116 S.Ct. 1356 (1996)

13  (claimant has the burden to prove she has a qualified impairment that meets the 12-month duration

14  requirement).

15          Plaintiff criticizes the ALJ's treatment of plaintiff's comments regarding Vicodin effects.

16  Plaintiff testified that Vicodin makes his "head kind of cloudy" to limit plaintiff to taking it at night

17  during which it helps him sleep and tolerate pain. (AR 45.) The logical inference is that plaintiff would

18  not need to take Vicodin during work hours.  The ALJ noted plaintiff's conservative treatment and

19  absence of treatment to address plaintiff's severe claims. (AR 22-24.) *See Johnson*, 60 F.3d at 1434

20  ("conservative treatment" suggests "a lower level of both pain and functional limitation."); *Sample v.*

21  *Schweiker*, 694 F.2d 639, 643 (9th Cir. 1982) (existence of an emotional disorder "is not per se

22  disabling," especially if "amendable to control.")

23          The ALJ properly focused on plaintiff's full-time parenting of his two school-age children and

24  household management in connection with his daily activities.  Plaintiff acknowledged that he drives

25  his children to school each day, does laundry and cooking, including dinner each night, and takes his

26  children for country drives. (AR 47, 48, 51, 54, 59, 136.) The ALJ bolstered his credibility evaluation

27  by noting plaintiff lacerated his finger at a deer skinning party which occurred, according to plaintiff,

28  after he stopped hunting.  Despite whether he had stopped hunting at the time of the skinning party, his

1    activity at the party is inconsistent with his alleged limitations.  The ALJ made specific findings to

2    substantiate doubt of plaintiff's alleged limitations, and substantial evidence supports such findings.

3    This Court is not in a position to second guess the ALJ's credibility findings.

4                                      **Hypotheticals To Ms. Chandler**

5            Plaintiff contends that the ALJ erred in omitting from his hypotheticals to Ms. Chandler a

6    limitation to sit four of eight hours.  Plaintiff further criticizes the ALJ's failure to adopt Ms. Chandler's

7    opinion based on Dr. Gregory's sweeping limitations.

8            In the final step of the five-step disability evaluation, the Commissioner has the burden to show,

9    in light of a claimant's residual functional capacity, he/she can engage in other substantial gainful work

10   that exists in the national economy.  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  The

11   Commissioner "can meet this burden by propounding to a vocational expert a hypothetical that reflects

12   all the claimant's limitations."  *Roberts*, 66 F.3d at 184.  Alternatively, the Commissioner can refer to

13   the Medical-Vocational Guidelines.  *Osenbrock*, 240 F.3d at 1162.

14           An ALJ may properly "limit a hypothetical to those impairments that are supported by substantial

15   evidence in the record."  *Osenbrock*, 240 F.3d at 1165.  An ALJ may so limit a hypothetical even when

16   medical evidence conflicts.  *Magallanes*, 881 F.2d at 756.  "An ALJ is free to accept or reject restrictions

17   in a hypothetical question that are not supported by substantial evidence."  *Osenbrock*, 240 F.3d at 1165;

18   *see Magallanes*, 881 F.2d at 756-757.  The parameters of an ALJ's hypotheticals need not "include any

19   alleged impairments that the ALJ has rejected as untrue."  *Long v. Chater*, 108 F.3d 185, 188 (8th Cir.

20   1997).  An ALJ is not bound to accept restrictions in a hypothetical question of claimant's counsel.

21   *Martinez v. Heckler*, 807 F.2d 771, 773 (9th Cir. 1986).

22           As discussed above, the substantial evidence of the record fails to support the limitations

23   suggested by Dr. Gregory or plaintiff.  Plaintiff points to no meaningful error with the ALJ's

24   hypotheticals, which addressed limitations found by the ALJ.  The evidence supports the scope of the

25   hypotheticals relied upon by the ALJ.  The ALJ was free to exclude from his detailed hypotheticals

26   limitations not supported by substantial evidence.

27                                      **CONCLUSION AND ORDER**

28           For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

1    properly concluded plaintiff is not disabled.  This Court further finds the ALJ's decision is supported

2    by substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this

3    Court DENIES plaintiff's request to reverse the Commissioner's decision to deny plaintiff disability

4    insurance benefits and SSI or to remand for further proceedings.  This Court DIRECTS the Court's clerk

5    to enter judgment in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security, and

6    against plaintiff Mike D. Clifton and to close this action.

7        IT IS SO ORDERED.

8    **Dated:  October 5, 2005**           **/s/ Lawrence J. O'Neill**
      66h44d                                        UNITED STATES MAGISTRATE JUDGE